[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* Slip Opinion No. 2016-Ohio-757.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-757

COLUMBUS CITY SCHOOLS BOARD OF EDUCATION, APPELLANT, *v.* FRANKLIN COUNTY BOARD OF REVISION ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision,* Slip Opinion No. 2016-Ohio-757.]

*Taxation—Real-property valuation—Expert appraiser's sworn statements and report can rebut presumptive validity of valuation based on prior sale price—Board of Tax Appeals' decision affirmed.*

(No. 2014-0883—Submitted October 13, 2015—Decided March 2, 2016.)

APPEAL from the Board of Tax Appeals, No. 2011-2227.

_____

**Per Curiam.**

{¶ 1} This real-property-valuation case concerns the proper valuation for tax year 2009 of a Comfort Inn hotel property located in Franklin County.  Appellee Buckeye Hospitality, Inc. ("Buckeye"), the property owner, filed a complaint seeking a reduction of the value assigned to its property, and the Franklin County

Board of Revision ("BOR") adopted the lower value opined by Buckeye's appraiser, with an adjustment. The Columbus City Schools Board of Education ("BOE") appealed to the Board of Tax Appeals ("BTA"), and the BTA affirmed the BOR's valuation.

{¶ 2} On appeal, the BOE contends that the BTA erred by relying on a defective appraisal. We disagree, and we therefore affirm.

### FACTUAL BACKGROUND

{¶ 3} This case addresses the tax-year-2009 valuation of a Comfort Inn property located at the Interstate 71 interchange on State Route 161 in Columbus. Buckeye acquired the property in January 2007 for $3,490,000, and that sale price constituted the auditor's valuation of the property for 2009, which was the year after a triennial update in Franklin County. The hotel is situated on 4.275 acres and is a 137-room facility.

*The BOR proceedings*

{¶ 4} Buckeye filed a complaint seeking a reduction in valuation to $2,002,000, and the BOE filed a countercomplaint seeking retention of the auditor's valuation. Buckeye substantiated its request at a hearing before the BOR by submitting an appraisal report and testimony from Charles G. Snyder, a state-certified general appraiser and member of the Appraisal Institute. Based on Snyder's extensive experience valuing hotel properties, the BOE's counsel stipulated to his credentials.

*Snyder's testimony concerning his decision not to use the 2007 sale of the subject property as a comparable*

{¶ 5} The focal point of this appeal is Snyder's decision not to use the January 2007 sale price of the subject property to support his valuation. As the BOE points out, the appraisal report contains a single sentence concerning the January 2007 sale: "Per the Franklin County public records, the subject property

most recently transferred January 26, 2007 from Janaki, Inc. to Buckeye Hospitality, Inc. for $3,490,000."

{¶ 6} At the BOR hearing, however, Snyder explained his decision on both direct and cross-examination. On direct, when asked why the sale price should not be viewed as indicative of value, he answered: "[S]ubstantially and continually declining income stream." When asked whether any relevant change in the national economy occurred in late 2008, Snyder noted the devastating effect of the general decline of the economy, but he returned to his point that "this property was indicating a declining revenue stream." More specifically, Snyder testified, "the occupancy [at the hotel] reduced substantially, declining in multiples of seven percent and four-plus percent from 2006 to '07 and '07 to '08."

{¶ 7} On cross-examination, the BOE's counsel asked Snyder whether he had considered the sale of the subject property as one of the comparables under his sale comparison. He responded that he had not. When pressed as to why not in light of his decision to use a 2006 sale of another property as a comparable, Snyder answered that he "often" would include the sale of a subject property as the "best sale but only in a circumstance where the markets are similar." Here, in Snyder's opinion, "the market between the acquisition price paid on the expectation of higher revenues by the current owner was * * * divergent from where values are as of" the January 1, 2009 tax-lien date. Snyder said that he "could have used it" but "chose not to" because of complications; specifically, "I would have had to have made a market condition and a circumstance-of-sale adjustment, and arguably I would have been back-dooring and coming back into a range by the other market indicators."

{¶ 8} Again pressed as to whether he could have made an adjustment to the 2007 sale of the subject property as he did to the 2006 comparable sale, Snyder stated that he had indeed made an adjustment to the 2006 sale but did not adjust later comparables (the sales during 2008) because they were "within the general time frame when the market really got soft."

*Snyder's opinion focused on the decline in the real estate market preceding the economic crash in the fall of 2008*

{¶ 9} Attached to Snyder's written appraisal report were documents labeled "Hotel Statistics," which he had used in the course of preparing the appraisal. The documents constituted financial reports for the subject property for 2007 and 2008. They demonstrate the phenomenon that Snyder attested to at the BOR hearing: the decline in financial performance of the property. Specifically, the RevPAR (revenue per available room[1]) for full-year 2007 and full-year 2008 indicate a decline of 7.5 percent—consistent with Snyder's testimony. Although the 2006 document is not included in the appraisal report, Snyder's testimony indicated that a similar reduction—or perhaps a 4 percent reduction—occurred from 2006 to 2007.

{¶ 10} The appraisal report discusses the more general decline in the performance of the lodging industry, explaining that this decline made the properties less attractive to potential buyers. Page 61 of the report reads that the "market started to decline sometime in early to mid 2008." Much data presented in the report—in particular, on pages 8 through 15—concerns the 2008-2009 timeframe, but the report also presents data supporting the softening of the market in 2007 and early 2008. In particular, the graph reprinted from a national study on page 11 shows fairly steep occupancy decline in 2007 over the entire industry.

{¶ 11} The record also contains hotel-performance data from Smith Travel Research ("STAR"), a service that provides such information. The STAR data supports the theory of decline both for the subject hotel and for its "Competitive

---

[1] RevPAR is the quotient arrived at by dividing the "[t]otal daily room letting revenue" by the "[t]otal hotel rooms (both sold and unsold)." Chris Guilding, *Accounting Essentials for Hospitality Managers* 78 (3d Ed.2014). RevPAR is a comprehensive measure of hotel viability because it "monitor[s] room sales performance" in terms of the "average revenue earned by every room in the hotel (both sold and unsold)," rather than focusing solely on revenue or occupancy in isolation from one another. *Id*.

Set" consisting of five competing hotels. The data shows an occupancy decline of 6 percent for 2007 and 1.2 percent for 2008 in the subject hotel's competitive set, while the decline for the subject hotel was 7.9 percent in 2007 and 9 percent in 2008. The STAR report also shows RevPAR declines for the competitive set of 1.5 percent for 2007 and 6.7 percent for 2008, while declines for the subject hotel were 7 percent in 2007 and 13 percent in 2008.[2]

*The BOR's decision*

{¶ 12} Snyder's appraisal employed a sales-comparison approach and an income-capitalization approach, reconciling the two approaches to arrive at a valuation of $2,002,000. In his reconciliation, Snyder calculated a "market value total asset business analysis" figure of $2,600,000. He then disaggregated the real estate value by deleting the tangible personal property (i.e., furniture, fixtures, and equipment or "FF&E") valued at $68,500 and the intangible "business value"—comprised of a $25,000 "franchise value" and an additional $504,500.

{¶ 13} The BOR found Snyder's "market value total asset business analysis" figure of $2,600,000 to be well supported, but included in the value of the realty that amount which Snyder had allocated to intangible business value.[3] The BOR's valuation of $2,531,500 did not include the amount deducted for furniture, fixtures, and equipment.

*The BTA's decision*

{¶ 14} The BOE appealed to the BTA. The BTA considered and decided the case based on the BOR hearing testimony, the appraisal report, and the briefs. The BTA noted the presumptive validity of using the January 2007 sale price but

---

[2] The STAR report confirms the "Hotel Statistics" figures reprinted in the appraisal: both document a decline in occupancy of "total rooms" from 43.68 percent during 2007 to 39.72 percent during 2008—a 9 percent decline. The RevPAR decline has been discussed.

[3] This procedure accords with our doctrine that in valuing businesses such as hotels and self-storage facilities, the intangible "business value" should typically be included as part of the value of the real estate itself. *See Hilliard City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 139 Ohio St.3d 1, 2014-Ohio-853, 9 N.E.3d 920, ¶ 45.

held that its recency was rebutted by information in Snyder's appraisal. BTA No. 2011-2227, 2014 WL 2708167, *1 (May 1, 2014). Specifically, the BTA focused on Snyder's sale comparable Number 3 and sale comparable Number 4, both of which had sold once in 2006 and again in 2008. Snyder used the 2008 sale prices as the comparables and referenced the paired sales as a basis for a market adjustment to his first comparable. Noting the 10 percent and 5 percent declines for the sales of those properties, the BTA viewed the sale pairs as evidence of a general market decline. *Id.* On this basis, the BTA inferred that the January 2007 sale price of the subject property was too remote from the January 1, 2009 tax-lien date to be considered. *Id.*

{¶ 15} Having rejected the 2007 sale price, the BTA found that Snyder's valuation analysis was supported by the evidence, and it adopted the BOR's approach to arrive at a valuation of $2,531,300.

{¶ 16} The BOE has appealed.

## ANALYSIS

*Evidence rebutting a sale price's prima facie indication of value may be contained in an appraisal report and an appraiser's testimony*

{¶ 17} In this case, a January 2007 sale price of the property at issue was originally used by the auditor to value the property for tax year 2009, but the BOR and the BTA determined that that sale price was not indicative of the property's value. Ordinarily, a recent sale price is presumed to indicate the property's value, and if the presumption is not overcome, appraisal evidence of an alternative value is ordinarily not competent evidence of the property's value. *Cummins Property Servs., L.L.C. v. Franklin Cty. Bd. of Revision*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, ¶ 13, citing *Berea City School Dist. Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 269, 2005-Ohio-4979, 834 N.E.2d 782. The presumptive validity of using the sale price may be rebutted by evidence showing that the sale is not recent, not at arm's length, or not voluntary. *Id.*

6

**{¶ 18}** Here, the BOR and the BTA determined that the presumption had been rebutted by the appraisal report and the BOR hearing testimony of the appraiser. The tribunals primarily relied on a finding that a change in market conditions made the sale too remote from the January 1, 2009 tax-lien date.

**{¶ 19}** At the outset, it should be noted that it is permissible to rely on information contained in an appraisal report and an appraiser's testimony to find that the presumptive validity of using the sale price has been rebutted. We have held that the appraiser's certification of the appraisal report, in particular the factual statements contained in it, forms a sufficient basis to permit the use of such information in determining value. *AP Hotels of Illinois, Inc. v. Franklin Cty. Bd. of Revision*, 118 Ohio St.3d 343, 2008-Ohio-2565, 889 N.E.2d 115, ¶ 16. And we conclude that the sworn statements of an expert appraiser at hearing in conjunction with his appraisal report can, by extension, serve to rebut the presumptive validity of valuation of the property at issue based on its prior sale price.

**{¶ 20}** To be sure, the mere fact that an expert has opined a different value should not be deemed sufficient to undermine the validity of the sale price as the property value. That would, of course, violate the *Berea* precept, as explained in *Cummins*, 117 Ohio St.3d 516, 2008-Ohio-1473, 885 N.E.2d 222, at ¶ 13. But specific information bearing on the question of the recency, the arm's-length character, or the voluntariness of the sale may be introduced as part of an appraiser's report and opinion of value and may thereby rebut the presumption and permit the appraiser's opinion of value to be considered.

*The record contained ample evidence to support the decision of the BOR and the BTA not to rely on the January 2007 sale price of the property at issue*

**{¶ 21}** The BOE places heavy reliance on the alleged absence of a market change between the January 2007 sale and the January 1, 2009 tax-lien date, going so far as to state that the appraiser "never claimed at any time * * * that the *subject property had lost any value between the date of the sale in January, 2007 and*

*January 1, 2009!*" (Emphasis sic). In actuality, although he chose different words, Snyder testified in substance that he did not use the sale because market conditions had changed during that period.

{¶ 22} Moreover, the record contains documentary evidence in support of finding a change in the market for hotels between January 2007 and the January 1, 2009 lien date. Specifically, as noted, the record documents a decline during 2007 and early 2008 not only for the subject property but also for its competitive set of comparable hotels.

{¶ 23} The BOE additionally claims that Snyder's appraisal contradicts itself by not making market-change adjustments to the 2008 comparable sales, given that the decline of the U.S. economy occurred in the fall of 2008. But Snyder's testimony and report clearly focused on *the real estate decline that preceded the decline of the economy*. Although Buckeye's counsel elicited at the BOR hearing Snyder's acknowledgment of the general decline of the U.S. economy, Snyder immediately resumed his discussion of an earlier decline in the real estate market. It was that decline that constituted the basis for his opinion. As a result, the BOE's argument in this regard lacks merit.

{¶ 24} Nor does the BOE's argument acquire any force by virtue of its contention that Snyder's failure to make a market-conditions adjustment to the 2008 comparable sales constitutes "affirmative evidence" that there was no change. For one thing, Snyder's report stated that the market change occurred in "early to mid 2008," and on top of that, the documentation in the appraisal report shows a market decline even during 2007. Beyond that, Snyder testified at the BOR hearing that the 2008 sales were not adjusted because they were "within the general time frame when the market really got soft." This testimony is consistent with the appraisal report, and the report is consistent with the testimony.

{¶ 25} The main flaw in the BOE's argument lies in its reliance on the notion that the fall 2008 decline of the economy was the relevant market event. For

8

Snyder, however, the economic decline in the fall of 2008 was not the most significant point; the "softening" of the market occurred earlier.

#### Knickerbocker *is inapposite*

{¶ 26} The BOE's reliance on *Olentangy Local Schools Bd. of Edn. v. Delaware Cty. Bd. of Revision*, 125 Ohio St.3d 103, 2010-Ohio-1040, 926 N.E.2d 302 ("*Knickerbocker*," after the property owner) is unavailing. The BOE compares the present case to *Knickerbocker* by observing that Snyder did not perform a market adjustment for the comparable sales occurring in February, March, May, or September 2008. Therefore, the BOE contends, no market change occurred.

{¶ 27} As discussed previously in this opinion, the record does contain evidence of an earlier market decline. But the *Knickerbocker* case is inapposite for two additional reasons. First and foremost, this court's analysis in *Knickerbocker* was based in large part on the deference we are required to afford to factual determinations of the BTA that are supported by the record. Here, by contrast, the BOE seeks reversal. Therefore, it must identify some legal precept in the *Knickerbocker* analysis that when applied here, requires reversal of the BTA's decision. It has not done so. Indeed, the testimony and the report are very consistent here.

{¶ 28} Second, the adjusted-comparable analysis in *Knickerbocker* is inapplicable in this case. In *Knickerbocker*, this court observed that the market adjustments made by the owner's appraiser were consistent with *a steadily rising market* from 2003 through the 2005 tax-lien date, which contradicted the owner's assertion that the 2003 sale price should not be used because of a decline in the market. *Id.* at ¶ 16-18. By contrast, no such contradiction between the evidence and the appraiser's assertion exists here.

*The BOE overlooks Snyder's opinion that to be indicative of the subject property's value, the sale price of the property would need two adjustments, not just one*

**{¶ 29}** The BOE's argument fails for an additional reason: it fails to account for Snyder's testimony that using the January 2007 sale price of the property at issue would require not only a market-conditions adjustment but a "circumstance of sale" adjustment as well. Snyder's appraisal report makes clear that his use of the term "circumstance of sale" refers to the "conditions of sale," which involves an adjustment for atypical motives in a sale that is not one at arm's length. As the Appraisal Institute has explained:

> When non-market conditions of sale are detected in a transaction, the sale can be used as a comparable sale but only with care. The circumstances of the sale must be thoroughly researched before an adjustment is made, and the conditions must be adequately disclosed in the appraisal. Any adjustment should be well supported with data. If the adjustment cannot be supported, the sale probably should be discarded.

Appraisal Institute, *The Appraisal of Real Estate* 329 (13th Ed.2008). The reference to a "circumstance of sale" adjustment indicates that Snyder felt that Buckeye paid too much given the hotel's ongoing performance at the time of sale— a circumstance consistent with Snyder's testimony that "the occupancy [at the hotel] reduced substantially, declining in multiples of seven percent and four-plus percent from 2006 to '07 and '07 to '08." Quite simply, Snyder's unrebutted opinion implies that the sale was not truly at arm's length because the buyer did not act as a fully knowledgeable, typically motivated market participant.

{¶ 30} The need to make not just one but two adjustments supports Snyder's decision not to use the 2007 sale price at all; it also suggests by implication that the sale not only lacked recency but also lacked arm's-length character. *See Bedford Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*, 132 Ohio St.3d 371, 2012-Ohio-2844, 972 N.E.2d 559, ¶ 40, fn. 3 ("We have noted that an arm's-length sale for tax-valuation purposes presupposes reasonably knowledgeable buyers and sellers"), citing *Worthington City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 129 Ohio St.3d 3, 2011-Ohio-2316, 949 N.E.2d 986, ¶ 22, fn. 2.

*The BOE's objection to the paired-sales analysis has been waived*

{¶ 31} The BOE's brief levels two criticisms at the paired-sale analysis employed in this case, one version of which was used by Snyder, the other by the BTA itself.[4] First, the BOE asserts that the reasoning underlying Snyder's analysis is circular in that he merely assumed that the lower sale price at the later date was due to a change in market conditions. But as we have previously discussed, the appraisal report and Snyder's testimony establish an evidentiary basis for concluding that a change in the market occurred.

{¶ 32} Second, citing Snyder's report and testimony, the BOE contests any reliance on the "paired sales," sale comparable Numbers 3 and 4, on the grounds that Snyder did not verify the arm's-length character of the earlier sale in either instance. The fact remains that the BOE failed to object to the report's use of the paired sales on that specific ground at the BOR, nor did the BOE's counsel press Snyder on that point. Additionally, neither of the BOE's two briefs at the BTA faulted the paired-sales analysis for that deficiency.

---

[4] Snyder used the paired-sale analysis as to his sale comparable Numbers 3 and 4 primarily to justify the 10 percent downward adjustment for his first comparable; relying on this background, the BTA used the paired-sale analysis directly to document a market change between the January 2007 sale and the tax-lien date.

{¶ 33} Accordingly, the issue, not having been raised before the finders of fact, has been waived.

## CONCLUSION

{¶ 34} For the foregoing reasons, we affirm the decision of the BTA.

Decision affirmed.

O'CONNOR, C.J., and PFEIFER, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL, J., dissents.

_____

**O'DONNELL, J., dissenting.**

{¶ 35} Respectfully, I dissent.

{¶ 36} I would reverse the decision of the BTA and apply the 2007 sale price as the auditor did to value the property for 2009 pursuant to statute.

_____

Rich & Gillis Law Group, L.L.C., and Mark Gillis, for appellant.

Karen H. Bauernschmidt Co., L.P.A., Karen H. Bauernschmidt, and Stephen M. Nowak, for appellee Buckeye Hospitality, Inc.

_____